Case number 23-1888. Mr. Peterson, good morning, whenever you're ready. Thank you. May it please the Court. William Peterson on behalf of the appellant, Zimmer Biomet Holdings, Inc. All benefits from patents must end when their terms expire. Arbitrators may not direct parties to violate the law, and the arbitration award at issue requires Zimmer to pay a perpetual royalty that was exchanged for now-expired patents, precisely what the Supreme Court prohibited in Kimball v. Brulotte. The parties were not free to make this agreement, and an arbitration award could not make it for them. The District Court erred by confirming the award, and this Court should vacate and remand. Public policy means that private parties are not free to make certain agreements. Those agreements include agreements to pay royalties perpetually as compensation for patents. Those royalties have to end when the patents expire. Mr. Peterson, assuming we accept your argument about the public policy exception and that we can review this pursuant to the public policy exception, this is not a direct appeal from a case that has proceeded through the District Court. This is an appeal of an arbitration, and the law is pretty clear that we have to take the contract as interpreted by the arbitrator, that we cannot reinterpret that. If we do that, and in your briefing, I don't think you really addressed this. So if we accept the 1998 agreement as interpreted by the arbitration panel, how do you win here? Because they specifically said that the royalties were not tied to the patent, that they were tied to a different agreement marketing. So I think it's important to distinguish, Your Honor, between two things, and that is the arbitrator's factual conclusions about the party's intent. We accept those but think they're irrelevant under a correct public policy analysis. The arbitrator's interpretation of the party's agreement, which we're willing to defer to. I don't think you have a choice. I think that's certainly true. But then there's also the arbitrator's analysis of public policy. So when you look at the arbitrator's statements about whether royalties are tied to patents or tied to marketing, we see that as an issue reviewed de novo for the Court because our sense is the arbitrator's applied the wrong test for what it means to be tied to. So when you look at the Supreme Court's decision in Kimball, it talked about a royalty for a hybrid agreement that was compensating a patentee for both patent rights that were conveyed and for trade secrets that were conveyed. And it said if you looked at that, if it's just a single unified royalty that was not distinguished between the patent rights and the other intellectual property rights, well, that's impermissible under Kimball. But it said you could imagine a world in which the royalty payment, part of it was tied to the patents. In other words, part of it was compensatory for the patents and part of it was compensatory for these other intellectual property rights. And the Supreme Court said that's permissible because it would be some tied to the patents. So the key there is it's not how the royalty is calculated. The Supreme Court did not say we're going to look closely at the royalty base, and there, in fact, you had a royalty base that included unpatented products. It was undisputed in Kimball that the WebBlaster product did not, in fact, practice the patents. So part of the royalty base in that case involved unpatented products. The Supreme Court, as we look at Kimball, said it's not about how the royalty is calculated. That would be a very odd rule, particularly given that patent royalties are often tied to a brand. It's about what the royalty is compensated for. Mr. Peterson, kind of going off the question that Judge St. Eve asked you, I don't think it's quite accurate to portray the arbitrator's finding as saying that the 1998 amendment somehow just changes the way royalties are calculated. I think they were persuaded by the position that Zimmer took in the Persona arbitration that I think this is the quote from the opening statements made by Zimmer in the Persona arbitration, that instead of products and technology that we're looking for, it's based on marketing as part of the next-gen need. And it has the effect of compensating Dr. Insullin's estate for components designed and manufactured long after his death by virtue of them being marketed in the next-gen need family. So based upon that and other issues, what the arbitrators found was not that, oh, what the consideration that is being given up is some sort of patent rights, but that the 1998 amendment completely severed that arrangement and now looked to the marketing rights and the way the products are marketed separate and apart from the products and technology. And we think that's the wrong inquiry in Kimball for public policy purposes. So as we see it, Justice Kagan told us, this is simplicity itself. So we think the right approach is to take all three, the original contract and the amendments, view them as a single agreement, which is what the arbitration panel told us. And then what you do is you look, what is on Zimmer's side of the ledger? What rights did Zimmer receive? It's undisputed that in that single agreement, Zimmer received patent rights from Dr. Insull. What did Zimmer promise in exchange? In exchange, Zimmer agreed to pay a royalty. It sounds like you're asking us to reinterpret that contract, though. The arbitration panel decided and concluded it should be looked at as one agreement and then construed how the royalties are paid based on marketing from the 1998 agreement. It sounds like you're telling us, no, no, no, that's wrong, that the royalties are still tied to the patent. But to make that conclusion, we have to interpret the contract. So, no, Your Honor, that's not what I'm asking you to do. What I'm saying is that a royalty that is paid based on a brand or marketing can still be compensation for patent rights that were conveyed. So we cited, for example, the Supreme Court's Zenith decision, where it upheld a royalty based on a brand. So it's important to distinguish between two things. How a royalty is calculated. We agree, following the arbitrator's findings, following the 1998 amendment, this royalty is going to be calculated based on the definition of a future knee system that you find on appendix page 316, and one of those components is marketing. But that doesn't change why Zimmer is paying Dr. Insull a royalty at all. What are we compensating him for? So it would be one thing if we looked at the 1998 negotiations and the parties said, you know what, it turns out Dr. Insull was not much of an inventor, but he truly was a fantastic marketer. It turns out his patents are valueless, but he has given us these amazing marketing insights and branding campaigns, and we are going to compensate him with a royalty because of the marketing services he provided to us. That's not what the parties' negotiations were. The royalties were still owed to Dr. Insull, paid to Dr. Insull, because of what he gave us in 1991, including the patent rights. Counsel, does it change your analysis that things changed between 1991 and 1998, right? So the patents were issued. Zimmer, as I understand it, were included as co-inventors, right? And so Zimmer's kind of status with regard to those patent rights in 1998 seemed somewhat different than the status of where Zimmer was in 1991, when the original agreement was negotiated. So does that have any relevance to the inquiry here? Well, I think it does. I think it actually shows why we have to be right about this. So we gave you the example from Kimball and Marvel in the briefing, the hypothetical, where the parties initially agree to one royalty. Marvel acquires the patent in exchange for that royalty. And then imagine a couple of years down the line, the parties decide to change how the royalty is calculated. Perhaps they change the payment schedule from quarterly to yearly. We suggested in the briefing a hypothetical in which Marvel buys down the royalty percentage. Now, in that hypothetical, imagine what the negotiations between Marvel and Kimball would look like. Well, Marvel already owns the patent at that point. The parties are doing this for their financial convenience. I'd say you could probably make all of the findings about those hypothetical negotiations that the arbitrators made here about our negotiations. The parties didn't talk about the patents. The parties did this for financial purposes. That's why they chose the particular royalty that they chose in my hypothetical. But none of that would undercut the actual fact that that royalty would still compensate Kimball for the patent that he gave to Marvel in the original agreement. What did the panel found? Again, in construing the contract, the panel found that the royalty payments were no longer tethered to the patents at all. And I think those are findings, which we're not disputing, about how the royalties are being calculated. I don't see those as findings about why Zimmer owes a royalty to Dr. Insull, because I think my friend would never dispute. They didn't give us more consideration in 1998. What happened was we gave them a patent or they gave us a patent. Well, that's not exactly right. I mean, I think that it seems like one can look at the facts and say the consideration they gave Biomet was that in 1994 the parties agreed to what they referred to as a compatibility provision, which would include technologies that might necessarily be taught in the patents. So all of a sudden there was some confusion about whether or not the 1994 amendment would require Zimmer to pay royalties to Dr. Insull based on technologies that weren't taught in the patents but were broader because they were somehow compatible with other products. And so it seems like that was the concern that the parties disputed and raised during the persona arbitration. And so why couldn't you say that the consideration that Dr. Insull gave was basically renegotiating that broader compatibility provision that wouldn't include the patent rights but other things outside the patents and gave that up in exchange for the marketing rights? So that's something the arbitration panel could have said. I think if you wanted to reach that conclusion, you probably would have needed a couple of findings, which you don't see here. And I think the findings you would have wanted to for that reason. But isn't that what the panel basically said by looking at the persona arbitration and looking at what Zimmer's position was in that arbitration, that basically that's a concern that led to the persona arbitration and Zimmer saying, look, it's no longer tied. We're doing this now based upon the marketing, setting aside the products and the technology. And, Your Honor, that's a focus on how the royalty is being calculated. It's not a focus on why the royalty is being paid. And I point you back to Kimball on this. The test is supposed to be simplicity itself. Is this royalty? Good morning, Mr. Peterson. Can I jump in here real quick? And I want to just kind of start back where we started the conversation. And here, the response to Judge St. Eve's question of why are we able to review the arbitration panel's decision at all. Looking at those four kind of reasons or buckets, and particularly I think we're charting 10A. And so, four, I'd like to hear your explanation for why we're kind of able to move forward, go where you're needing us to go to be able to resolve this issue. This court held in Affymax v. Ortho McNeil that manifest disregard remains a ground to vacate an arbitration award to the extent recognized in George Watts and Son. And in Titan Tire Corporation, it clarified the standard of review to take the facts as found by the arbitrators, but when a public policy question is raised, to review the arbitrator's conclusions de novo and reaffirm that public policy is ultimately a question for the court. Although that was a labor arbitration, it cited Hall Street, it cited Affymax, it cited George Watts and Sons. And keep in mind that George Watts and Son drew its standard from Eastern Associated Coal. So the distinction, my friend, it tends to draw between the two isn't borne out by this court's precedent. Unless the panel has questions, I'd like to reserve the remainder of my time for rebuttal. Judge Pryor, did you want to do any follow-up there? No, thank you. Okay. Thank you. Mr. Ash. Thank you. Good morning. Good morning, Your Honors. My name is Richard Ash. May it please the court. I think I'd like to start out with what Judge Pryor's last line of inquiry. The leading case, in fact, probably the only case in this circuit dealing with the issue of whether and under what circumstances a court is allowed to consider a public policy argument arising in an arbitration. The leading case is Baxter v. Abbott Labs. And in Baxter, this court very clearly held that public policy is an issue. It's always an issue. But it's an issue to be determined by the arbitrators and not by the court. Mr. Ash, how helpful is Baxter to you in light of our opinions in Titan Tire and Chrysler Motors? Titan is completely off the point because it's a labor arbitration case. In my brief, I – We've read your brief, so – There are exceptions to that rule. But those exceptions – How do you get around Chrysler Motors, where we specifically said that the public policy doctrine allows this court to decide de novo whether the arbitrator's order violates public policy? Your Honor, I believe that was a labor case as well. I don't – I'm not sure, and I'm not sure that matters. Well, there are cases in this circuit that say it does. Is that your response to the question? Well, yeah. To me, it matters that if a – there are several cases cited in our brief that say that limits the right to review on public policy grounds. A decision of arbitrators is either in a labor case or obviously where the rights of third parties are involved or where a party is – the parties are directed to violate the law. That is something that – a positive violation of the law. And so you're going to find cases that still talk about public policy. But there are no cases that I could find where one of those three exceptions wasn't present. And Baxter is the – to me, is the clearest case. Are you aware that since Baxter, which I think was about 20 years ago, we have never cited that case for the proposition that a court cannot review public policy questions? I am aware of that, Your Honor. But I also believe that you have never cited a public policy question in a commercial case arising from an arbitration that does not fall within one of the three exceptions. Why do you make the commercial case distinction versus – Because the courts do. The courts – Where? What are you relying on for that? Let me find it. Well, in Hyatt, for example, Hyatt distinguishes Titan. Hyatt Franchising versus Shenzhen says that all of the cases cited in Titan Tire rely on collective bargaining agreements as a necessary feature for vacating an arbitration award on public policy grants. Counsel, how do you – in W.R. Grace, the Supreme Court case that kind of kicked this whole thing off, the Supreme Court says on page 766, as with any contract – that's the preface – as with any contract, however, a court may not enforce a collective bargaining agreement that is contrary to public policy. What are we to make of the phrase, as with any contract? Well, you know, without – with respect to the Supreme Court, that was dicta. It was not necessary for the decision in that case. And in fact, in that case, the Supreme Court upheld the decision of the arbitrators. So one can question how much thought went into that throwaway line. But cases since then, the – this circuit has not been concerned with that dictum. And Baxter is a clear example of that. And Baxter has been followed in Pyrenees and in Hugh Sokol. But the – after stating that, the Supreme Court cites a case, Heard v. Hodge, right, which dealt with restrictive covenant rights. So that's not a collective bargaining agreement. No, it falls within another one of the exceptions, which is it affects the rights of a third party. In that case, as I recall, the court was concerned with a restrictive covenant, which says you can't sell to people of a certain race. And that obviously affects a third party. So it doesn't violate my understanding of the rules. If I can maybe switch gears just back to assuming that the court does have the power to review this. We agree fully with the comments that Your Honors made. There is no question but that the panel looked at – studied carefully the agreement. They studied both the 91 and the 98 agreement, were fully aware of the blood issue, and interpreted it in a way that divorced the payment of royalties from patents. The courts used the word decoupled and that the patent provisions in the 91 agreement became vestigial. And as Your Honor pointed out, this idea – Zimmer set the table for that conclusion. Zimmer's lawyers, witnesses in the persona arbitration, clearly said that this is a new way of awarding royalties. And when you think about – and the other thing they said, which I think has a fair amount of relevance here, is that in Brulotte and Kimball and every other case that we've been able to find all over the country, there's never been a case where the patent was already owned by the licensee at a time when the contract was negotiated. And the relevance of that is that Kimball and Brulotte and all those other cases rely on this concept that if you have a patent, you have a monopoly, and if you have a monopoly, you have leverage. And the panel found as a fact that Dr. Insall had no leverage in 1998 because he didn't own the patents anymore. Not only were there co-inventors, but he had assigned the patents to Zimmer. They owned the patents, not him. And so he had no leverage. There was nothing that he could give away other than this compatibility provision, which has nothing to do with patents. There were circumstances under which a non-next-gen product could give rise to a royalty. But interestingly enough, in the 1998 contract, those circumstances do not include any mention of patents. They relate to geometry. So the test as to whether something was next-gen or not next-gen was geometry, not patents. And theoretically, Zimmer would have been free to use Dr. Insall's patents in a new product that did not contain the geometries that are set forth in the agreement and would not owe Dr. Insall a 1 percent royalty. And is the requirements in the 1998 agreement with regard to geometry and the other factors, were those factors more narrow than the compatibility provision for products that would follow that? And to follow up what you're questioning of Mr. Peterson, it was very clear from the testimony of Zimmer's witnesses that this 1998 agreement was not a gift by one party to the other. In the words of the witness, it was a quid pro quo. It was a new deal. So the right to a patent, according to Zimmer's lawyers, was no longer based on product or technology. And that, to me, is the linchpin of the arbitrator's decisions. And I think they got it right. And I also think that whether they got it right or didn't get it right, they interpreted the agreement and they were entitled to do that under the law. If there are no further questions, I'll let you go. Judge Pryor, do you have any questions? No. Okay. All right, thank you very much. Thank you. Mr. Peterson, rebuttal. Thank you, Your Honor. Very briefly, the Baxter case that my friend spoke to arose under Article V, Section 2B of the convention, a particularly narrow and unique public policy defense applicable to secondary jurisdictions under the convention. With respect to the core argument on the merits, we agree. There are findings about how the royalty is calculated in 1998. We're not challenging them. There are findings about what the royalty is based on in 1998. We're not challenging them. But none of those, in our view, goes to the core public policy question under Kimball. Why is the royalty being paid? Is it a benefit that flows to Dr. Insall and the estate because of the patent rights he conveyed to us in 1991? Absolutely. The parties agreed to one royalty in exchange for those patent rights. They exchanged it for a slightly different royalty in 1994. They exchanged that for a slightly different royalty in 1998. But what is he being compensated for? Why does Zimmer owe a royalty at all? It's because of the patent rights that received from Dr. Insall in 1998. That's where the arbitrators went wrong. They focused on why this royalty was chosen, and they focused on how the royalty is calculated. Even if your argument is correct, wouldn't that require us to construe the contract? The arbitrators, we don't think, construed the contract any differently. I don't think my friend disputes that appendix page 316, but it's not a question of contract construction. It's simply a question of looking at the consideration that was exchanged. But wouldn't you have to construe the contract to determine why under your argument? I suppose you could, but it's never been disputed. When you look at the consideration on both sides, that Zimmer, in 1991, received patent rights, there was never a novation. The parties never said, we're going to wipe out that original agreement and replace it with another one. So when you take the original agreement and the amendments and you put them together, which is, I think, how contract amendments have to be looked at, applying the simple test of Kimball, it's a simple question. Were patent rights received on one side? Yes. Is a royalty being paid on the other? Yes. That's a simple test, and that means the royalty has to end when the patents expire. Thank you, Your Honor. Thank you, Mr. Peterson. The court will take the case under advisement.